**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**ALBERT WOLFE**                                          **CIVIL ACTION**

**versus**                                                      **NO. 11-2906**

**N. BURL CAIN, WARDEN**                          **SECTION: "H" (1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of

conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed

findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C)

and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States

District Courts.  Upon review of the record, the Court has determined that this matter can be

disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the

following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH**

**PREJUDICE**.

Petitioner, Albert Wolfe, is a state prisoner incarcerated at the Louisiana State

Penitentiary, Angola, Louisiana.  On June 12, 1997, he was convicted of second degree murder

under Louisiana law.[1]  On October 31, 1997, he was sentenced to a term of life imprisonment

without benefit of probation, parole, or suspension of sentence.[2]  On April 21, 1999, the Louisiana

Fourth Circuit Court of Appeal affirmed that conviction and sentence.[3]  Petitioner's related writ

applications were then denied by the Louisiana Supreme Court on December 10, 1999,[4] and by the

United States Supreme Court on May 15, 2000.[5]

On October 17, 2000, petitioner filed a *pro se* application for post-conviction relief

with the state district court.[6]  While that application was still pending, petitioner, through counsel,

filed supplemental applications in 2004.[7]  When his counsel failed to appear for a hearing on the

applications, the matter was continued without date on January 10, 2005.[8]  At an unknown point

thereafter, petitioner retained new counsel, who filed a motion to reopen the dormant post-conviction

proceedings.[9]  Almost a decade after the first post-conviction relief application was filed, relief was

---

[1]  State Rec., Vol. VI of XI, transcript of June 12, 1997, pp. 66-67; State Rec., Vol. I of XI, minute entry dated June 12, 1997.

[2]  State Rec., Vol. VI of XI, transcript of October 31, 1997; State Rec., Vol. I of XI, minute entry dated October 31, 1997.

[3]  State v. Wolfe, 738 So.2d 1093 (La. App. 4th Cir. 1999) (No. 98-KA-0345); State Rec., Vol. II of XI.

[4]  State v. Wolfe, 756 So.2d 281 (La. 1999) (No. 99-K-1460); State Rec., Vol. V of XI.

[5]  Wolfe v. Louisiana, 529 U.S. 1115 (2000) (No. 99-8599); State Rec., Vol. V of XI.

[6]  State Rec., Vol. III of XI.

[7]  State Rec., Vols. III and IV of XI.

[8]  State Rec., Vol. I of XI, minute entry dated January 10, 2005.

[9]  State Rec., Vol. III of XI.

finally denied by the state district court on April 29, 2010.[10] Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on September 16, 2010,[11] and by the Louisiana Supreme Court on April 25, 2011.[12]

On October 26, 2011, petitioner filed the instant federal application for *habeas corpus* relief claiming that he received ineffective assistance of counsel in the state criminal proceedings.[13] The state concedes that the federal application is timely[14] and that petitioner has exhausted his remedies in the state courts.[15]

## I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

---

[10] State Rec., Vol. III of XI, transcript of April 29, 2010; State Rec., Vol. III of XI, minute entry dated April 29, 2010.

[11] State v. Wolfe, No. 2010-K-0900 (La. App. 4th Cir. Sept. 16, 2010); State Rec., Vol. II of XI.

[12] State v. Wolfe, 62 So.3d 83 (La. 2011) (No. 2010-KP-2258); State Rec., Vol. XI of XI.

[13] Rec. Doc. 1.

[14] Rec. Doc. 15, p. 8.

[15] Rec. Doc. 15, p. 11.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), <u>cert. denied</u>, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

<u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694; <u>see also</u> <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), <u>cert. denied</u>, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of

imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

## II. Facts

In the instant case, petitioner was charged with the murder of Zarnell King. On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

On the evening of October 13, 1995, Dewayne Thomas was looking out of his second-story bedroom window at Painters Street and Johnson Street in New Orleans. He could see Painters and Almonaster Streets from his window. He saw three men, two sitting and one on a bicycle, on the corner near an old neighborhood grocery store. He saw another man riding a bicycle down North Prieur Street. Thomas saw the man slide the bike under a black vehicle parked near the intersection of North Prieur and Painters Street, and approach the corner on foot. As the man came from the side of the building, he pulled a gun and fired once at the man on the bicycle. After shooting the victim once, the man approached the victim and shot him two more times. The victim had been seated on a bicycle and fell over after the first shot. The two men on the corner ran off when the shots were fired. The shooter ran down Painters Street towards the lake. Thomas grabbed his gun and proceeded downstairs. He ran after the shooter. However, the shooter disappeared on Almonaster Street. Thomas then went back to the crime scene. No one was outside. Soon thereafter, the police arrived. The victim was dead when the police arrived. Some people outside of the neighborhood came out as the police arrived. Thomas spoke with the police briefly. Later,

he spoke with Detective Harris. Thomas gave a statement and was shown some photographs. Thomas identified the defendant at trial as the person who shot the victim. He knew the defendant from the neighborhood. Thomas identified the perpetrator as wearing dark jeans, an Indiana Pacers jersey with a black tee shirt underneath, and a Nike cap. The perpetrator was approximately five feet nine inches tall. At the first trial, Thomas described the perpetrator as five feet five inches tall, one hundred eighty-five pounds, and having light brown skin. On October 18, 1995, Thomas saw the defendant in the area of Painters Street and Almonaster Street. He called the police and gave them a description of the defendant.

Detective Michael Mims, a homicide investigator with the New Orleans Police Department, assisted in the investigation. The officer went to the crime scene and spoke with Dewayne Thomas. The officer also assisted in the execution of the search warrant for the defendant's house. A thirty eight-caliber bullet and some clothes were retrieved from the defendant's house.

Officer Renard Smith received a call for assistance on October 18, 1995. He was told to go to the intersection of Prieur Street and Almonaster Street and search for a subject wearing a black tee shirt and a black cap with a Nike emblem on the front. The request was relayed from the Homicide Division. Officer Smith and his partner, Officer Leonard Carr, proceeded to the area and searched for the subject. At first they did not see anyone fitting the description. They circled the area twice and then noticed a black male fitting the description exit 2615 North Prieur Street and walk across the street to the Winn Dixie supermarket. The officers approached the subject and informed him that he was being detained. They transported the subject to the Homicide Division. The officers also confiscated a bicycle from the subject. A person on the scene claimed he owned the bicycle and complained when the officers took the bike. The bicycle was not processed for fingerprints.

Rhonda King, the victim's mother, testified that on October 13, 1995, her son left home earlier that day on his bike. He returned home around 5:00 p.m. with Ricky Landry. Landry jumped off the victim's bike and left. The victim asked her to fix him something to eat. After he ate supper, he asked his mother to fix him a bath. Ms. King ran her son's bath water and went outside. While she was outside, the victim came out and told her he would be right back. He was going to Ricky's grandmother's house. The victim never returned.

Sgt. Joseph Tanner was present during the statement taken from the defendant by Detective Kenneth Harris on October 18, 1995. Sgt. Tanner testified that the defendant was advised of his rights. After speaking with the officers for a while, the defendant stated that he wished to stop the statement. The interview then ended, and the defendant was transported to Central Lockup.

Ricky Campbell testified that he was standing on the corner of Painters and North Prieur Street on the evening of October 13, 1995. Campbell was on the corner with his sister, Robin, Ricky Landry and Cedric Martin. Campbell, his sister and Landry were trying to purchase marijuana from Martin. Campbell did not see the defendant that night. While they were talking to Martin, the victim rode up on his bike. Out of the corner of his eye, he saw a guy turn the corner and heard a shot. Campbell turned and looked. When he saw the guy, he started running. He then heard two more shots. The shooter was wearing black pants, a black, yellow and white jersey and a black, yellow and white Marvin Gaye cap. The suspect was approximately six feet one inch in height and had a dark complexion. Campbell acknowledged his prior convictions for shoplifting, possession of stolen property, theft, and possession of marijuana. The witness did not speak with the police on the night of the shooting.

Ricky Landry, the victim's cousin, testified that he was standing on the corner of Painters and N. Prieur Street with a few other people when the victim got shot. Landry stated that he, the victim, Ricky Campbell and Cedric Martin were talking when an unknown black male came up and shot the victim. After the victim got shot, Landry and Campbell ran to Campbell's mother's house. Landry called his grandmother and told her to call King's grandmother and tell her that King had been shot. Landry then returned to the scene. He did not see the defendant or the perpetrator. Landry described the perpetrator as being dark, slim, and approximately six feet one inch in height. Landry spoke with the police officers on the scene. He gave the officers Zarnell's name and address. The police never contacted him again. He eventually spoke with someone from the District Attorney's office. Landry testified that the defendant was not the shooter. Landry testified that he did not recognize the shooter as someone from the neighborhood.

Landry acknowledged his prior convictions for possession of stolen property and possession of crack cocaine.[16]

### III. Petitioner's Claims

Petitioner claims that he received ineffective assistance of counsel in the state court proceedings. The United States Supreme Court has established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case,

---

[16] Wolfe, 738 So.2d at1094-97; State Rec., Vol. II of XI.

viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner's ineffective assistance of counsel claims were rejected by the state courts in the post-conviction proceedings. Because such a claim is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be

no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S.Ct. 770, 785-86 (2011) (citation omitted). The Supreme Court then explained:

Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added). The Court finds that, under these stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claims for the following reasons.

Petitioner first claims that his counsel was ineffective for failing to subpoena alibi witnesses. In the last reasoned state court opinion addressing this claim, the Louisiana Fourth Circuit Court of Appeal rejected the claim, holding:

According to the relator, these witnesses (Linda Watson and Shanna Jefferson) testified at his first trial [which ended in a mistrial], stating that he walked them home from a card party on St. Ferdinand Street at 10:45 p.m. on the night of the murder. The relator argues the testimony of these witnesses "clearly" would have assisted the defense and, accordingly, counsel was ineffective for failing to subpoena them for the second trial. Although their testimony at the hearing on the relator's motion for a new trial hearing attempted to place the relator at the card game at the time of the shooting, Ms. Watson conceded that she did not connect the card game to the shooting until a few weeks before the motion hearing when she spoke to the woman who held the game. Similarly, although Ms. Jefferson claimed the relator left the card game after 10:30, in response to questions by the trial court as to when this card game occurred, she could only state that it occurred in October and that she thought the year was 1995 because it was two years prior to the hearing; she could not pinpoint the date of the card game. Thus, neither of these witnesses could testify with certainty the card game they remembered

occurred on the date of the murder. Moreover, the relator did not call trial counsel to testify as to why he did not call these witnesses. As noted by the trial court at the April 2010 hearing, counsel may have believed that these witnesses were not credible, and his decision not to call them may have been a part of trial strategy, which cannot be considered to be ineffective assistance of counsel if it is not successful. Under these circumstances, we do not find the relator met his burden of showing his trial counsel was ineffective for failing to subpoena these witnesses. Accordingly, we find no error in the trial court decision to deny this claim.[17]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[18]

As noted by the state court, a trial counsel's decision concerning whether to call a witness is normally one of trial strategy; in fact, there is a "strong presumption" that such a decision was strategic in nature. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); see also Green v. Cockrell, No. 02-20650, 2003 WL 21145722, at *2 (5th Cir. Apr. 29, 2003) ("A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance."); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints based upon uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy ...."). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

---

[17] Wolfe, No. 2010-K-0900, at pp. 9-10; State Rec., Vol. II of XI.

[18] State v. Wolfe, 62 So.3d 83 (La. 2011) (No. 2010-KP-2258); State Rec., Vol. XI of XI.

That presumption is particularly applicable in instances such as this one. As the

United States First Circuit Court of Appeals has noted:

> The decision whether to call a particular witness is almost always
> strategic, requiring a balancing of the benefits and risks of the
> anticipated testimony. The witness may not testify as anticipated or
> the witness's demeanor or character may impress the jury
> unfavorably and taint the jury's perceptions of the accused; or the
> testimony, though sympathetic, may prompt jurors to draw inferences
> unfavorable to the accused. Where the prosecution's case is less than
> compelling ..., the risk of "rocking the boat" may warrant a decision
> by trial counsel to forego the presentation of further defense
> testimony, even favorable testimony. Johnson v. Lockhart, 921 F.2d
> 796, 800 (8th Cir.1990) ("since the government has the burden of
> proving guilt beyond a reasonable doubt, it may not be necessary for
> the defense to introduce evidence to meet the constitutional
> requirement of effective representation"); cf. [United States v.]
> Natanel, 938 F.2d [302, 310 (1st Cir. 1991)] ("additional arguments
> could only impair [a] client's seemingly secure position.... In
> litigation, as in life, there is much to be said for such maxims as 'if it
> ain't broke, don't fix it,' and 'quit when you're ahead'").

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted).[19]  The court continued:

> Reasonably competent trial counsel might well have determined that
> the best prospect for acquittal lay in discrediting the government's
> witnesses, rather than presenting additional testimony which could
> appear to legitimate the government's case or raise questions about
> the defense not previously suggested by the government's evidence.

Id.

In the instant case, the state's case was based on the testimony of a single eyewitness,

Dewayne Thomas, who purportedly observed the crime while looking out of his second-story

bedroom window at night. In light of that arguably weak evidence, petitioner's counsel felt that it

---

[19]  Although the court in Lema spoke of the perceptions of a jury, the same concerns obviously
exist where, as in the instant case, a judge is the trier of fact.

was unnecessary to call Watson and Jefferson.[20]  That judgment call is especially understandable

since their testimony would have proved little or nothing, in that neither Watson nor Jefferson could

testify with any degree of certainty that the events they purportedly recalled even occurred on the

night of the murder.  Considering those factors and the reasoning outlined in Lema, a reasonable

basis obviously exists for the state court's decision to deny petitioner's claim.[21]

Petitioner next claims that his counsel was ineffective for failing to object to the

introduction at trial of a bullet and a photograph of a bicycle.  In the last reasoned state court opinion

addressing those claims, the Louisiana Fourth Circuit Court of Appeal rejected them, holding:

> The relator next contends counsel was ineffective for failing
> to object to the introduction of a bullet that was found during a search
> of his house and photographs of a bicycle that he was riding at the
> time of his arrest.  He does not indicate what caliber the bullet was or
> what caliber weapon was used in the shooting.  He argues the bicycle
> that he was riding at the time of his arrest was not the same bicycle
> that the perpetrator was seen riding.  He argues that the State failed
> to tie either of these items to the murder and counsel should have
> objected to their introduction.  However, he fails to show any
> prejudice from the introduction of either of these items at trial and,

---

[20]  In his federal application, petitioner states:  "Counsel told [petitioner] that the witnesses were not necessary because the jury was undoubtedly going to acquit him of all charges.  Counsel relied upon the fact that subsequent to Wolfe's first trial, the jury was of the majority to acquit before the trial court ruled as a mistrial."  Rec. Doc. 1, pp. 21-22.

[21]  Moreover, the fact that some jurists might have reached a contrary conclusion with respect to petitioner's claim is of no moment.  As noted previously, that simply is not the test; in fact, the test required the AEDPA is quite the opposite.  As previously noted:  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is *any reasonable argument* that counsel satisfied Strickland's deferential standard."  Harrington v. Richter, 131 S.Ct. 770, 788 (2011) (emphasis added).  Here, as explained, there obviously is such a reasonable argument, and petitioner's claim must therefore be denied.

thus, fails to show counsel was ineffective for failing to object to
their introduction.  These claims have no merit.[22]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[23]

The state court decision on these claims was neither contrary to, nor involved an

unreasonable application of, clearly established federal law, as determined by the Supreme Court

of the United States.  On the contrary, federal law holds that a decision of counsel to forgo a

particular objection is generally one of trial strategy, and, as such, is normally insufficient to support

an ineffective assistance claim.  See, e.g., Rios-Delgado v. United States, 117 F. Supp. 2d 581, 589

(W.D. Tex. 2000) ("Generally speaking, a failure to object, standing alone, does not rise to the level

of constitutionally deficient performance.  In cases where an accused complains that counsel was

ineffective because he did not object to something ..., the courts grant significant deference, as such

actions fall squarely within the ambit of trial strategy.").  As previously noted, federal *habeas* courts

are not to second-guess counsel's strategic decisions through the distorting lens of hindsight but

instead are to employ a strong presumption that the conduct falls within a wide range of reasonable

assistance.  Strickland, 466 U.S. at 689; see also Burnett v. Collins, 982 F.2d 922, 930 (5th Cir.

1993).

Such deference is particularly appropriate here, in that the "evidence" at issue was

of little, if any, importance.  Although Officer Mims testified that the bullet was found in a search

---

[22]  Wolfe, No. 2010-K-0900, at p. 11; State Rec., Vol. II of XI.

[23]  State v. Wolfe, 62 So.3d 83 (La. 2011) (No. 2010-KP-2258); State Rec., Vol. XI of XI.

of petitioner's house,[24] the bullet was in no way connected to the weapon used in the crime. Further, while Thomas identified the bicycle in the photograph as the one ridden by the perpetrator,[25] that identification was suspect at best. Thomas had earlier testified that he was unable even to tell the color of the bicycle he saw, noting that it could have been white or silver.[26] Moreover, Officer Smith testified that another person in the parking lot where there bicycle was confiscated claimed that the bicycle in fact belonged to him.[27]

Accordingly, even if the evidence in question was objectionable, the evidentiary value of the bullet and the photograph was minimal at best and it is unlikely that the introduction of that evidence at the bench trial played any role in petitioner's conviction. Because there simply is no reasonable probability that the result of the proceeding would have been different if defense counsel had objected to the introduction of the bullet and the photograph, petitioner cannot show the prejudice required to prevail on these claims.

Petitioner also claims that his counsel was ineffective for failing to introduce, in connection with petitioner's motion for a new trial, a statement from Cornell Harris. Even if petitioner had a constitutional right to effective assistance of counsel in connection with the motion

---

[24] State Rec., Vol. VI of XI, transcript of June 11, 1997, p. 57.

[25] State Rec., Vol. VI of XI, transcript of June 11, 1997, p. 46.

[26] State Rec., Vol. VI of XI, transcript of June 11, 1997, p. 6.

[27] State Rec., Vol. VI of XI, transcript of June 11, 1997, p. 68.

for a new trial, a point of law which the state does not contest in this proceeding,[28] this claim has no merit for the following reasons.

After holding evidentiary hearings concerning the motion for a new trial, the state district court denied relief on October 31, 1997. In connection with petitioner's writ application challenging that denial, the Louisiana Fourth Circuit Court of Appeal summarized the evidence adduced at the hearings as follows:

> At the first hearing on relator's motion for new trial, Linda Watson testified she was playing cards with the relator at the time of the shooting. She estimated the relator was at the card game during the time period from 9:30 to 10:00 p.m. before leaving to walk two women home. She testified she heard about the shooting, but she could not "pinpoint the name at the particular time, you know." She stated she finally spoke to someone about the card game after she spoke with the woman who hosted the card game about two weeks before the hearing.
>
> Robin Hilton testified she is Ricky Campbell's sister, and she was present when the victim was shot. She testified she knows the relator and he was not the shooter. She stated she had been on the corner with Campbell, speaking with several men and she saw a man ride by on a bicycle. As she was leaving, she saw the man on the bicycle pass by again and park the bike behind a truck. She then heard shooting. She described the man on the bike as tall and dark-skinned, wearing a yellow and white shirt, a cap, and dark pants. She stated she tried to return to the scene after the shooting, but another man stopped her and told her that her brother was unharmed. She stated she testified at the relator's first trial.
>
> On cross-examination, Ms. Hilton testified that the relator lived around the corner from where she formerly lived. She

---

[28] The United States Fifth Circuit Court of Appeal has held that "there is a Sixth Amendment right to the assistance of counsel at the motion for new trial, during the post-trial, pre-appeal period, in Texas, because it is a critical stage." McAfee v. Thaler, 630 F.3d 383, 393 (5th Cir.), cert. denied, 132 S.Ct. 754 (2011). However, that decision turned on the specifics of Texas law, see id. at 391-93, and the Fifth Circuit has not yet addressed whether the same is true with respect to cases arising in Louisiana state courts.

described his house as being across the street from a grocery store that she frequented seven or eight times a day, and she saw him all the time. She admitted she did not see the shooting, but she contended she saw the shooter put the gun back in his pants after the shooting. She maintained she did not see the relator on the scene during the shooting.

Delores Webster testified she witnessed the shooting from her porch at 2522 North Prieur. She stated she saw a man ride up on a bike and park the bike at the end of a truck parked on the corner. She stated the man walked to the end of the corner, rushed around the corner, and fired three times. She testified the man was not the relator. After the shooting, Ms. Webster saw Thomas come out of his house and walk past the victim who was lying in the gutter. She pointed out the victim and Thomas walked over to the victim, then stood with her and her husband until the police arrived. Ms. Webster stated she did not see Thomas chase anyone from the scene.

Ms. Webster testified she also saw Cedric Martin standing on the corner and that it was Martin, not the victim, who had a bicycle. She stated another man and a woman were on the corner with Martin and the victim, although the woman left before the shooter rode up on another bike. Ms. Webster stated she did not testify at either trial and only became involved when her son told the relator's brother that she had seen the shooting from the porch. She denied telling anyone prior to that contact that she had seen the shooting. She stated she knew the relator and knew that he had been arrested for the shooting, but she did not contact the police to tell them that they had arrested the wring person. She denied knowing the victim or seeing him in the neighborhood.

Shanna Jefferson testified she invited the relator to the card game at her mother's house on St. Ferdinand Street. She estimated the relator arrived at the game at 8:00 p.m. According to Ms. Jefferson, the relator left at approximately 10:45 to walk two women, Tranice and Tracey, home after one of the women remarked that she had to leave because it was after 10:30. She testified she would have been available to testify at the relator's second trial. She concluded her testimony by stating that the card game was held in October and she thought it was held in 1995.

At the second new trial hearing, Cedric Martin testified he witnessed the shooting. He stated he received a call from the victim's cousin, Ricky Landry, between 9:30 and 10:00 p.m. on the evening of the shooting and walked out of his friend's house. Robin Hilton, standing with her brother and the victim, asked him if he had

change for a $20 bill and he replied that he did not. He stated the victim, whose name he did not know but who formerly dated his cousin, asked him about his cousin. At that point, a dark-skinned man dressed all in white started shooting at the victim from the corner. Martin testified he tried to get out of the way, and the man ran up to the victim, shot him again, and then ran from the scene. Martin asserted he knows the relator who was not the shooter and that the shooter was taller and darker-skinned than the relator. Martin testified that, although two assistant district attorneys visited him in jail and took his statement, he was never called for either trial. He clarified that he assumed the men who interviewed him worked for the district attorney's office because they said they were attorneys. He stated that he was in jail at the time of trial.

On cross-examination, Martin testified he did not tell anyone prior to going to jail that he had seen the shooting, but that Ricky Landry told the attorneys who interviewed him that he was present when the victim was shot. He thought the unknown attorneys interviewed him in the spring of 1996. He insisted that he did not see Thomas on the scene the night of the shooting or see anyone chasing the shooter, but conceded he ran straight home after the shooting. He insisted the only person with a bicycle on the scene that night was the victim. He admitted he was in jail because he failed to pay court fees for his probation for a drug offense. He denied selling drugs to anyone on the night of the shooting.[29]

However, petitioner notes that Cornell Harris had given a statement on September 12, 1997, in which he contended that petitioner did not shoot Zarnell King. In the instant claim, petitioner argues that his counsel was ineffective for failing to introduce that statement in support of the motion for new trial. In rejecting that claim, the Louisiana Fourth Circuit Court of Appeal held:

[T]he relator argues counsel was ineffective at the hearing on his motion for new trial for failing to attempt to introduce a statement, given by Cornell Harris to counsel's investigator, wherein Harris testified he witnessed the shooting and the relator was not the

---

[29] Wolfe, No. 2010-K-0900, at pp. 5-8; State Rec., Vol. II of XI.

perpetrator. The relator notes this statement was taken in the back of the courtroom sometime between the date he was convicted and the date of the hearing on the motion for new trial. In the statement, which relator attaches to his writ application, Harris stated he knew the victim, and he also knew the relator "on the street" as being part of a drug gang. Harris indicated he had been with the victim and the victim's cousin earlier on the day of the murder and had entered a store just prior to the shooting. He stated he heard gunshots as he was coming out of the store and saw a tall, dark male, possibly with some gold teeth and wearing a hood, running away from the scene of the murder. Harris stated he had seen the same man on a bike earlier and would have recognized the relator if the relator had been on the scene. He also denied seeing anyone chasing the man. Harris indicated many people wanted to kill the victim because the victim had been robbing other drug dealers. Harris indicated the victim's brother Kantrell and another man knew who really killed the victim and were looking for that man.

The relator now argues that his counsel should have also called Harris or attempted to admit his statement at the hearing on his motion for new trial. However, the anticipated testimony of Harris would have been merely cumulative to that of Ricky Campbell and Ricky Landry who both testified they were with the victim at the time of the murder and the relator was not on the scene. Harris' testimony would also have been cumulative to the testimony of other witnesses at the new trial hearing who stated that the relator was not on the scene. In addition, as noted above, the relator did not call his trial counsel at the hearing to ask why he did not call this witness. The trial court, as the trier of fact at the relator's trial and given the other witnesses who testified that the relator was not the perpetrator, found that the inclusion of Harris' proposed testimony would not have affected its verdict. Thus, even if counsel was deficient by failing to call this witness, the relator failed to show this deficiency prejudiced him because his anticipated testimony would not have affected the verdict. This claim has no merit.[30]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[31]

---

[30] Wolfe, No. 2010-K-0900, at pp. 10-11; State Rec., Vol. II of XI.

[31] State v. Wolfe, 62 So.3d 83 (La. 2011) (No. 2010-KP-2258); State Rec., Vol. XI of XI.

As noted by the state court, numerous witnesses were presented in the hearings concerning the motion for new trial, and Harris's statement or testimony would have been merely cumulative of the testimony already presented at those hearings and at trial. It is clear that a decision by counsel to forego presenting cumulative testimony does not constitute ineffective assistance. See, e.g., Coble v. Quarterman, 496 F.3d 430, 436 (5th Cir. 2007); Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 2004); Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *11 (E.D. La. Oct. 16, 2009), aff'd, 444 Fed. App'x 835 (5th Cir. 2011). Accordingly, this claim has no merit.

Lastly, petitioner claims that his counsel was ineffective for failing to object to testimony regarding an out-of-court identification by Thomas because that pretrial identification had previously been ruled inadmissible.[32] Although petitioner's argument with respect to this claim is unspecific, the testimony at issue is apparently that of Thomas himself, who testified in passing that he had identified a photograph of petitioner shown to him by Detective Harris.[33]

In the last reasoned state court opinion addressing this claim, the Louisiana Fourth Circuit Court of Appeal denied relief, holding:

> [T]he relator alleges counsel was ineffective for failing to object to testimony concerning a pretrial identification the court had earlier suppressed. In support of this claim, the relator supplies a minute entry of August 16 [sic], 1996, wherein the judge who preceded the trial judge in that section of court granted the relator's motion to suppress the identification. Some time prior to trial, the present judge

---

[32] At a hearing on August 26, 1996, Judge Alvin Oser suppressed the out-of-court identification by Thomas. State Rec., Vol. VI of XI, transcript of August 26, 1996, p. 22.

[33] See State Rec., Vol. VI of XI, transcript of June 11, 1997, pp. 16-17 and 27.

was elected to the bench. At trial, it appears that the detective who conducted the lineup testified that the eyewitness, Dwayne Thomas, identified the relator from the lineup as the perpetrator. The relator now asserts trial counsel was ineffective for failing to object to this testimony but makes no argument in support of this assertion. The minute entry shows the relator was represented by his first counsel at the hearing on the motion to suppress and, accordingly, it is likely that neither the trial judge nor trial counsel was aware at trial that this identification had been suppressed by the previous judge. Thus, it is arguable that counsel was deficient in failing to object to this evidence. However, the relator fails to show prejudice from this failure. Thomas testified at trial, positively identifying the relator, whom he knew, as the person who shot the victim and who he chased. Accordingly, this error was harmless. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (an error is harmless when it can be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict); see also Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely attributable to the error). Given Thomas's testimony in court, the introduction of evidence pertaining to his pretrial identification of the relator would not have contributed to the verdict and counsel's failure to object to the introduction of the identification was harmless. The relator has failed to show that counsel's failure prejudiced him and his final ineffective assistance of counsel claim fails.[34]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[35]

---

[34] Wolfe, No. 2010-K-0900, at pp. 11-12; State Rec., Vol. II of XI. This Court notes that the state court's assumption that the reference at issue was made by the officer who conducted the identification procedure is wrong. That officer, Detective Harris, did not testify at petitioner's trial, and the officers who did testify did not comment on the photographic identification. Rather, as noted previously, it appears that the challenged reference is the one made by Thomas during his testimony.

[35] State v. Wolfe, 62 So.3d 83 (La. 2011) (No. 2010-KP-2258); State Rec., Vol. XI of XI.

It is important to note that petitioner is claiming only that his counsel was ineffective for failing to object to the testimony regarding the *pretrial* identification; he does *not* challenge either the *in-court* identification made by Thomas or argue that counsel was ineffective for failing to challenge that *in-court* identification as impermissibly tainted.[36]  In light of the emphatic and

---

[36]  Out of an abundance of caution, this Court notes that it disagrees with the state district judge's ruling suppressing the pretrial identification and further finds that there was certainly no basis for suppressing the in-court identification for the following reasons.

At the suppression hearing, Detective Harris testified that Thomas had telephoned the police and notified them that the perpetrator was at a specific location.  The police then went to that location and arrested an individual.  Detective Harris thereafter showed Thomas a photograph of the person arrested, in order to confirm that the individual arrested was in fact the person about whom Thomas had called.  He confirmed that the individual arrested was the person he meant.  The state district judge suppressed the photographic identification because Thomas had been shown only a single photograph.

However, even if the use of a single photograph was unduly suggestive, that alone would not make the identification inadmissible.  On the contrary, as the United States Fifth Circuit Court of Appeals has explained:

> The Due Process Clause protects against the use of evidence obtained from impermissibly suggestive identification procedures.  The admissibility of identification evidence is governed by a *two*-step test:  First, we determine whether the identification procedure was impermissibly suggestive, and *second, we ask whether the procedure posed a very substantial likelihood of irreparable misidentification*.  If we answer *both* questions in the affirmative, the identification is inadmissible.  This is known as the <u>Brathwaite</u> test, after <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

<u>United States v. Moody</u>, 564 F.3d 754, 762 (5th Cir. 2009) (quotation marks and citations omitted; emphasis added).  Therefore, the use of a impermissibly suggestive procedure does not in and of itself require suppression of the identification if, despite the procedure's flaws, there was no substantial likelihood of irreparable misidentification.  In the instant case, Thomas *knew* Wolfe from the neighborhood.  <u>See</u> State Rec., Vol. VI of XI, transcript of June 11, 1997, pp. 17 and 28-29.  Where, as here, the witness recognizes the perpetrator as someone he already knows, there simply is no substantial likelihood of irreparable misidentification.  <u>See</u> <u>United States v. Hefferon</u>, 314 F.3d 211, 219 (5th Cir. 2002); <u>United States v. Buckhalter</u>, 986 F.2d 875, 878 (5th Cir. 1993); <u>Sholes v. Cain</u>, Civ. Action No. 06-1831, 2008 WL 2346151, at *16 (E.D. La. June 6, 2008), <u>aff'd</u>, 370 Fed. App'x 531 (5th Cir.), <u>cert. denied</u>, 131 S.Ct. 292 (2010).

unchallenged *in-court* identification,[37] the testimony regarding the pretrial identification was superfluous and ultimately of no consequence. Therefore, there is simply is no reasonable probability that the result of the proceeding would have been different if defense counsel had objected to the comments concerning the pretrial identification, and, as a result, petitioner cannot show the prejudice required to prevail on this claim.

In summary, petitioner has not demonstrated that the state court decision rejecting his various ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects all of petitioner's ineffective assistance of counsel claims.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Albert Wolfe be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

---

[37] State Rec., Vol. VI of XI, transcript of June 11, 1997, pp. 17-18.

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[38]

New Orleans, Louisiana, this fourteenth day of May, 2012.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[38] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.